STATE OF CONNECTICUT *v.* MARK A. EDWARDS
(AC 27113)

Bishop, Gruendel and Dupont, Js.

Argued October 18, 2006—officially released April 17, 2007

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom were *Jonathan C. Benedict*, state's attorney, and, on the brief, *C. Robert Satti, Jr.*, senior assistant state's attorney, for the appellee (state).

GRUENDEL, J. The defendant, Mark A. Edwards, appeals from the judgments of conviction, rendered after a jury trial of four consolidated cases, of two counts of murder in violation of General Statutes § 53a-54a (a), two counts of felony murder in violation of General Statutes § 53a-54c, one count of capital felony in violation of General Statutes (Rev. to 1999) § 53a-54b (8), two counts of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (2), two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), two counts of robbery of an occupied motor vehicle in violation of General Statutes § 53a-136a, three counts of larceny in the second degree in violation of General Statutes § 53a-123 (a) (1), and two counts of carrying a pistol or revolver without a permit in violation of General Statutes § 29-35. On appeal, the defendant's nine enumerated claims constitute allegations that (1) the state produced insufficient evidence (a) to establish his identification and (b) to prove that the guns were operable, (2) the court violated his constitutional right to due process by precluding him from (a) representing himself and (b) testifying in his defense, (3) he improperly was charged with and convicted of felony murder because the information did not allege that he had committed the underlying felony of attempt to commit robbery, (4) the court violated his constitutional guarantee against double jeopardy, and (5) he was convicted improperly under § 53a-136a because it is merely a sentence enhancing statute. We affirm in part and reverse in part the judgments of the trial court.

The jury reasonably could have found the following facts. On December 3, 2000, at around 1 a.m., the defendant robbed Mark Komani, who had driven to an

address in Ansonia to deliver pizza. When Komani arrived, the defendant, waiting on the sidewalk, requested the pizza and began taking out some money. When Komani began to take the pizza out of the insulated bag, the defendant put a gun to his head and said, "Don't move." He demanded money and Komani gave him about $30. After demanding that Komani exit the vehicle and remove the pizza delivery sign from the top, the defendant drove off in the vehicle. About two weeks later, the Ansonia police department found the car parked behind the house where the defendant's grandmother lived.

During the early morning hours of December 4, 2000, Sigmund Kamenski drove a white Buick to a Dunkin' Donuts in Ansonia, where he entered the store to buy a cup of coffee. After Kamenski returned to his vehicle and put the keys in the ignition, the defendant partially opened the driver's side door, pointed a gun at him and demanded money. Kamenski left the car and gave him the $35 to $40 that he had with him, and the defendant entered the car and drove away.

Shortly before 6 p.m. on December 10, 2000, the defendant entered the Wood Plus Deli in Bridgeport. Velvet Harris, a regular customer at the deli, was inside, and two employees, Abo Kali Jwaid and Abdul Nasser Hinoun, were behind the counter. The defendant, at the counter, asked Harris if he was "straight," i.e. finished with his business, and told him to wait outside. After Harris left the deli, the defendant pulled a gun from his waistband and demanded money from the two employees. When they resisted, the defendant shot them. He ran out of the door, passed by Harris and got into the passenger seat of Kamenski's white Buick, which sped away. Jwaid and Hinoun died within minutes of the shooting.

On December 15, 2000, the defendant was driving the Buick in Bridgeport with a friend. Officer Heriberto

Rodriguez of the Bridgeport police department saw the Buick and, seeing that the defendant was not wearing his seat belt, checked the license plate number in his computer. After learning that the car had been stolen, Rodriguez broadcast a description of the Buick to other police officers and initiated pursuit. Soon after, with lights and sirens activated, three police vehicles were following the Buick, which ultimately stopped on a gravel embankment leading to railroad tracks. The defendant and his friend exited the vehicle and ran in different directions. A few minutes later, the defendant was apprehended by the police officers, and a gun was found within his flight path. The gun was tested at the state police laboratory and found to be the same one as that used to kill the two deli employees. In addition, the defendant's fingerprints were found in the Buick and on the glass freezer cover of the Wood Plus Deli.

The defendant was charged in four separate informations that corresponded to the four incidents. Prior to trial, the state moved to consolidate the cases, and the defendant did not oppose the motion, which the court granted. Following a jury trial, the defendant was found guilty of two counts of murder, two counts of felony murder, one count of capital felony, two counts of attempt to commit robbery in the first degree, four counts of robbery in the first degree, two counts of robbery of an occupied motor vehicle, three counts of larceny in the second degree and two counts of carrying a pistol or revolver without a permit. In each of the first two cases, those involving Komani and Kamenski, the trial court merged the conviction on a second count of robbery in the first degree with the conviction on the first robbery count. In the case involving the murders of Jwaid and Hinoun, the trial court merged the murder convictions as to each victim with the capital felony conviction. The court also merged the convictions on the underlying felonies of attempt to commit robbery

in the first degree with the felony murder convictions. The defendant was sentenced to life imprisonment without release plus forty-six years. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that the evidence was insufficient to establish his identification as to the four crimes involving Kamenski, and to prove that the gun used in the crimes involving Komani and Kamenski was operable.[1] We disagree and address both of these claims in turn.[2]

We begin by setting forth the well established standard of review for a sufficiency of the evidence claim. In so doing, we apply a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"The evidence must be construed in a light most favorable to sustaining the jury's verdict. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . .

---

[1] We review the defendant's sufficiency of the evidence claim first because that claim, "if successful, would necessitate the entry of a judgment of acquittal . . . ." (Citation omitted.) *State* v. *Murray*, 254 Conn. 472, 478, 757 A.2d 578 (2000).

[2] Although the defendant failed to preserve these claims at trial, we afford review of his challenges to the sufficiency of the evidence. See *State* v. *Adams*, 225 Conn. 270, 275 n.3, 623 A.2d 42 (1993).

Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . .

"We do not sit as a [thirteenth] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. . . . We are content to rely on the [jury's] good sense and judgment." (Internal quotation marks omitted.) *State* v. *Serrano*, 91 Conn. App. 227, 241–42, 880 A.2d 183, cert. denied, 276 Conn. 908, 884 A.2d 1029 (2005).

## A

The defendant claims that the evidence was insufficient to establish his identity as the perpetrator of the four crimes related to Kamenski. Specifically, he claims that the evidence was insufficient because Kamenski could not positively identify him as his attacker, and the remaining evidence was merely circumstantial. We are not persuaded.

Before the defendant could be found guilty of robbery, larceny and robbery of an occupied vehicle, the state was required to prove the element of identification beyond a reasonable doubt. See *State* v. *Smith*, 280 Conn. 285, 302, 907 A.2d 73 (2006) ("[i]t is black letter law that in any criminal prosecution, the state bears the burden of proving beyond a reasonable doubt the defendant's identity as one of the perpetrators of the crime charged"). The defendant argues that "[t]here was no evidence that Kamenski ever identified [the] defendant as the robber to [the] police, and an in-court identification was never attempted. At trial, Kamenski

testified [that] he did not get a good look at the perpetrator . . . ." Nevertheless, although at trial he initially was unable to remember specifically the perpetrator's clothing during the incident that occurred almost three years earlier, after reading his statement to the police given at that time, Kamenski recollected that the perpetrator had been wearing a gray sweatshirt, which corresponded with what the defendant was wearing when he was apprehended. He also had described accurately the defendant's height, weight, skin color and facial characteristics, and had helped the police construct a composite sketch. We reject the contention that the minor inconsistencies in Kamenski's testimony are significant. "In our review of the evidence to determine its sufficiency, we do not look at the evidence to see whether it supports the defendant's innocence. . . . Instead, our focus is whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Farnum*, 275 Conn. 26, 36, 878 A.2d 1095 (2005).

In addition, the defendant had expressed a motive to commit the crime when he told his friend that he was having financial problems and that he needed more money to pay for studio time. At trial, the friend testified as follows:

"[The Prosecutor]: Now, during the times when you were with the defendant . . . did he have any discussions with you about his financial situation?

"[The Witness]: Somewhat.

"[The Prosecutor]: And anything—did you have any discussions about money problems or everything was fine?

"[The Witness]: Just he needed a little bit more money to pay for his studio time; that's it."

The motive expressed to his friend increases the strength of the inference of the defendant's identity as the one who committed the crimes. See *State* v. *Farnum,* supra, 275 Conn. 34 (evidence sufficient to identify defendant as perpetrator because, in part, jury reasonably could have inferred that defendant had motive to commit crime); see also *State* v. *Ford,* 230 Conn. 686, 695–96, 646 A.2d 147 (1994) (same).

The defendant further argues that "[t]he remaining circumstantial evidence is insufficient to establish that [the] defendant was the person who robbed Kamenski. While [the] defendant ended up with Kamenski's car, that alone does not prove beyond a reasonable doubt that he was the person who stole it." His argument is unavailing. Circumstantial evidence has the same probative force as direct evidence, and "[i]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt . . . ." (Internal quotation marks omitted.) *State* v. *Padua,* 273 Conn. 138, 147, 869 A.2d 192 (2005). "The jury is entitled to draw reasonable inferences from the evidence before it and, in performing its function, the jury brings to bear its common sense and experience of the affairs of life." (Internal quotation marks omitted.) *State* v. *Ramirez,* 94 Conn. App. 812, 822, 894 A.2d 1032, cert. denied, 278 Conn. 915, 899 A.2d 621 (2006).

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that Kamenski's testimony, coupled with the circumstantial evidence, was sufficient to establish the identity of the defendant as the perpetrator of all four crimes related to Kamenski.

B

The defendant also claims that the evidence was insufficient to prove that the gun used in the robberies of Komani and Kamenski was operable. He argues that

because his conviction on two of the counts of robbery in the first degree required that the gun be operable, the state's failure to prove its operability mandates that his conviction of the crimes be vacated.

The defendant was convicted under § 53a-134 (a), which provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ." General Statutes § 53a-3 (6) provides the definition of a "deadly weapon" as "any weapon, whether loaded or unloaded, *from which a shot may be discharged*, or a switchblade knife, gravity knife, billy, blackjack, bludgeon, or metal knuckles. . . ." (Emphasis added.) The defendant claims that, although there was evidence that he had pointed the gun at Komani and Kamenski, "there was no proof that the gun was capable of discharging a shot. There was also no evidence for the jury to infer that the gun used in the Wood Plus Deli case was the same gun used in these two robberies, and any such inference was speculative."

On the contrary, there was ample evidence for the jury to conclude that the same gun was used in all three incidents. Both Komani and Kamenski described a gun that matched the one used in the Wood Plus Deli murders. Kamenski had worked as a constable and security officer, and had a familiarity with handguns. His rather detailed description of the gun that had been pointed at him corresponded with the gun that had been found in the defendant's flight path when he was apprehended.[3] Komani, though not as familiar with handguns as

---

[3] Kamenski testified that "it was a dark gun. I'm not sure if it was black, but it was a dark gun, and it looked from my experience like a .32 caliber, small barrel, short."

Kamenski, testified that the gun that had been pointed at his head was "[b]lack and small." Both descriptions matched the gun that was found, through ballistics testing, to be the one used in the Woods Hill Deli shootings. In addition, the defendant's friend testified that the defendant had shown him a .32 caliber handgun. "The operability of a firearm can be proven either by circumstantial or direct evidence." *State* v. *Bradley*, 39 Conn. App. 82, 91, 663 A.2d 1100 (1995), cert. denied, 236 Conn. 901, 670 A.2d 322 (1996).

Accordingly, there was sufficient evidence for the jury to conclude that the gun used in the robberies involving Komani and Kamenski was operable, and the defendant's claims thus fail.

## II

The defendant next claims that the court improperly violated his constitutional rights by denying his request to represent himself and by preventing him from testifying.[4] We disagree. The defendant concedes that these claims are unpreserved and requests review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[5]

[4] The defendant makes his claims under the fifth, sixth and fourteenth amendments to the United States constitution, and article first, § 8, of the Connecticut constitution. We note, however, that because the defendant has failed to provide an independent analysis of his state constitutional claims, we decline to review them. See *State* v. *Faust*, 237 Conn. 454, 465 n.10, 678 A.2d 910 (1996); *State* v. *Galarza*, 97 Conn. App. 444, 449 n.5, 906 A.2d 685, cert. denied, 280 Conn. 936, 909 A.2d 962 (2006).

[5] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40. "The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 90, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007).

We afford the defendant review of his claims because the record is adequate for review and the right to represent oneself and the right to testify clearly implicate the defendant's constitutional rights. We will address each of these claims in turn.

A

In his claim that the court improperly violated his constitutional rights by denying his request to represent himself, the defendant specifically argues that the court failed to conduct a thorough inquiry pursuant to Practice Book § 44-3 and that its denial was based on improper factors. We disagree.

The following additional facts are necessary for our disposition of the defendant's claim. On November 10, 2003, at the commencement of the third day of the evidentiary portion of the trial, the defendant's counsel stated: "I've had a chance to consult with my client . . . briefly before the session began, and he has indicated to me that he is at the point where he is going to discharge me. He wants to represent himself. . . . I advised him [that] this is the wrong thing to do. This is not the only way to go. I am extremely experienced. He says it is not personal. He has to take care of his own matters with his own strategy. So, I advised the state, and I'm advising you on the record. I would expect you would inquire of [the defendant] to determine whether he is doing the right thing or not." The court proceeded to canvass the defendant to determine whether the defendant's request was made knowingly, intelligently and voluntarily.

We first set forth the appropriate standard of review. "[T]he determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. . . . This

important decision rests within the discretion of the trial judge." (Internal quotation marks omitted.) *State v. Bangulescu*, 80 Conn. App. 26, 43, 832 A.2d 1187, cert. denied, 267 Conn. 907, 840 A.2d 1171 (2003). Our task, therefore, is to determine whether the court abused its discretion in denying the defendant's request to represent himself.

We begin by noting that the defendant's request was clear and unequivocal. "[A] waiver of the right to counsel must be clear and unequivocal. *Faretta v. California*, [422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)] . . . ." (Internal quotation marks omitted.) *State v. Taylor*, 63 Conn. App. 386, 405, 776 A.2d 1154, cert. denied, 257 Conn. 907, 777 A.2d 687, cert. denied, 534 U.S. 978, 122 S. Ct. 406, 151 L. Ed. 2d 308 (2001). "The clear and unequivocal request formulation has been said to have developed primarily as a standard designed to minimize abuses by criminal defendants who might be inclined to manipulate the system. . . . If an unequivocal request were not required, convicted criminals would be given a ready tool with which to upset adverse verdicts after trials at which they had been represented by counsel." (Citation omitted; internal quotation marks omitted.) *State v. Gethers*, 197 Conn. 369, 377 n.8, 497 A.2d 408 (1985).

The state argues that, despite the statement by the defendant's attorney that "[h]e wants to represent himself," when personally addressed by the court, the defendant made no such request. On the contrary, the clear and unequivocal statement by the defendant's attorney was sufficient.[6] See, e.g., *State v. Gethers*, 193

---

[6] We further note that there is no talismanic language required for the request to be considered clear and unequivocal. "Connecticut courts have refused to attach talismanic significance to the presence or absence of particular words or phrases. See, e.g., *State v. Robinson*, 227 Conn. 711, 731, 631 A.2d 288 (1993) (failure to use 'talismanic' words does not indicate failure to make necessary determination); *State v. Onofrio*, 179 Conn. 23, 45, 425 A.2d 560 (1979) ('[t]here is no talismanic ritual of words that must be spoken by a dying declarant' to render statements admissible); *State v.

Conn. 526, 531, 480 A.2d 435 (1984) (defendant's attorney informed court that defendant wanted to exercise right to examine jurors without attorney's participation). The fact that the court began to canvass the defendant personally, immediately following the attorney's statement, provides further proof that the court considered the request to be clear and unequivocal. Cf. *State* v. *Carter*, 200 Conn. 607, 613, 513 A.2d 47 (1986) (in absence of clear and unequivocal assertion of right to self-representation, trial court has no independent obligation to inquire into defendant's interest in representing himself). The prosecutor also recognized the clear and unequivocal request during the colloquy by stating, "Your Honor, I just want to make it . . . clear that before we start on the record, [the defendant's attorney] brought [the defendant's desire to represent himself] to the attention of myself and the court in chambers." The prosecutor then proceeded to compare the case to *State* v. *Bangulescu*, supra, 80 Conn. App. 26, in order to emphasize the canvass that must occur to determine whether the request would be honored. For the aforementioned reasons, we conclude that the defendant's request through his attorney was indeed clear and unequivocal.[7]

"Although it may be settled law that a criminal defendant has an absolute right to self-representation, that

*Peters*, 89 Conn. App. 141, 146, 872 A.2d 532 ('the fact that the court did not use the specific words "psychiatric disabilities" does not warrant reversal under the plain error doctrine'), cert. denied, 274 Conn. 918, 879 A.2d 895 (2005); *State* v. *Peters*, 40 Conn. App. 805, 823, 673 A.2d 1158 (jury charge not improper for failure to recite talismanic words), cert. denied, 237 Conn. 925, 677 A.2d 949 (1996)." *State* v. *Janulawicz*, 95 Conn. App. 569, 576 n.6, 897 A.2d 689 (2006).

[7] The state also cites *State* v. *Flanagan*, 93 Conn. App. 458, 890 A.2d 123 (2006), to support its claim that the defendant's request was untimely. Nevertheless, we decline the state's invitation to find that the request in this case was untimely because there was no indication from the court that timeliness or disruption of the proceedings was a factor in the court's decision to deny the defendant's request to represent himself.

right is not self-executing. A trial court in this state must satisfy itself that several criteria have been met before a criminal defendant properly may be allowed to waive counsel and proceed pro se. . . . Those criteria include a determination by the court (1) that the defendant is competent to waive counsel, and (2) that his waiver is knowing, intelligent and voluntary." (Internal quotation marks omitted.) Id., 41–42. The court made no indication that the defendant was not competent to waive counsel. In fact, both attorneys informed the court that, despite initial questions of the defendant's competency to stand trial, the defendant was later found to be competent. "When a defendant is found competent to stand trial, as a matter of law, a court is bound to rule that he is also competent to waive the right to counsel." Id., 42.

The pertinent question, then, is whether the court correctly determined that the defendant's request was not knowing, intelligent and voluntary. Practice Book § 44-3 provides in relevant part: "A waiver [of the right to counsel] will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant: (1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled; (2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself; (3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and (4) Has been made aware of the dangers and disadvantages of self-representation."

We disagree with the defendant's claim that the court failed to conduct a thorough inquiry. We note that it is unnecessary for a court specifically to question the defendant on each of the factors listed in Practice Book § 44-3. Cf. *State* v. *Porter*, 76 Conn. App. 477, 496–97,

819 A.2d 909 ("the court may accept a waiver of the right to counsel without specifically questioning a defendant on each of the factors listed in [Practice Book § 44-3] if the record is sufficient to establish that the waiver is voluntary and knowing" [internal quotation marks omitted]), cert. denied, 264 Conn. 910, 826 A.2d 181 (2003). On the contrary, the record reveals that the court conducted a thorough inquiry. It asked about the defendant's education, abilities, trial strategy and whether he understood the severity of the various charges against him. It also advised the defendant that his attorney was very capable, offering to appoint him as a "standby lawyer" who would sit with him to offer assistance if asked. Additionally, the court questioned the defendant several times about whether he wanted his attorney to continue to represent him.[8] The defendant explained that he had no trial strategy and would simply offer "[w]hatever comes to my head." It was only after the thorough canvass that the court concluded: "I can't make a determination that [the defendant's] waiver is knowingly and intelligently and voluntarily made at this stage, so I'm going to order that [the defendant's attorney] remain in the case as principal counsel. . . . Based on the present state of the record, there is no way in good conscience I could allow him to proceed and be his own counsel."

Accordingly, the court did not abuse its discretion in concluding that the request was not knowing, voluntary

---

[8] After an apparent pause following one of those questions, the court stated: "You know, at this stage, since you're not responding to my question, I can only assume—I can only assume that you're not telling me that you don't want him; that you don't want him after I talked to you about this. I'm going to ask him to continue in this capacity until you indicate there is some reason to discharge him as your attorney." Although the defendant claims that his silence did not relieve the court of the duty to honor his request, we reiterate that only if the court finds the request to be knowing, intelligent and voluntary will it be able to allow the defendant to waive his right to counsel. See *State* v. *Bangulescu*, supra, 80 Conn. App. 41–42.

and intelligent, and in denying the defendant's request to represent himself.

### B

The defendant also claims that the court violated his constitutional rights by improperly preventing him from testifying in his defense before the jury. He claims that the court's action of requiring him to submit to an offer of proof violated his constitutional right. We disagree.

The record reflects that, after the state rested its case, the defendant's attorney informed the court that the defendant desired to testify and to call various witnesses to testify in his defense. The defendant's attorney briefly explained that the defendant planned to call his sister, mother and father to comment on his state of mind and the circumstances under which he was raised. His attorney explained that "[e]ventually, [the defendant's] desire is to take the [witness] stand, and I know Your Honor would give him the appropriate advisory regarding that, and [the defendant] desires to tie it all up so that we get a snapshot of him from his formative years all the way through December, 2002, to this present time where the trier of fact can see the type of turmoil, character flaw, internal conflict, that was going on within him." The remainder of the discussion related to whether lay testimony used in this fashion would be admissible evidence.

The following day, during a lengthy discussion with the attorneys regarding the relevance of the testimony, the court stated that it was not going to allow evidence about the defendant's childhood at this stage in the proceedings, and that it would be more appropriate for the sentencing hearing. The court explained that "I don't want it to come before the jury cold, you know, and then move to strike it and that damage has been done." The defendant's attorney sought to clarify the court's statements regarding the defendant: "I would ask, since

the defendant, my client, is intending on presenting testimony, are you requiring an offer of proof from his mouth, as well?" The court answered, "I'm not going to order it. Based on the state of the record, I'm not going to let him get up there and testify about his childhood and so forth. That's not relevant to what the issues are in this particular case. So, if he has something—something, I can't preclude it, but I can preclude that. But if you have something better by way of an offer of proof, I would certainly consider it . . . ."

The court proceeded to inquire of the defendant whether he wanted to testify even though his attorney had advised against it. After the defendant's affirmation, the following colloquy ensued:

"The Court: All right. And tell me, without going into details, your reason for testifying.

"[The Defendant]: Because it's, like, I try to—during my time, I was trying to communicate with my doctors. It's, like, I wasn't getting across to them, and they wasn't understanding, nobody was understanding, and I just want to get up there and speak the truth and—but also see what was going on with me because it's, like, you know—I can't really explain it, but.

"The Court: All of that is not relevant to this trial, however. So that you've been found competent. You've been found competent to stand trial. I can't stop you from testifying, if you want to; however, I am not going to allow you to testify to matters that are not properly—questions to be decided, questions of fact to be decided by the jury, and as it relates to the charges in this case. Do you follow what I'm saying?

"[The Defendant]: Yes, but, um—

"The Court: So, I'm going to tell you that—I'm going to let your lawyer—if you want to testify, you can come

up here and testify under oath in the absence of the jury, and then I will make a decision as to whether or not any of it is admissible and whether or not I will allow you to testify. Do you understand?

"[The Defendant]: Yes."

After carefully explaining to the defendant that he did not have an obligation to testify and that "the jury can't draw any adverse inference from your failure to testify," the court asked him if he understood.

"[The Defendant]: That's what I want to—can I address—

"The Court: Sure, talk to me. That's what I'm here for.

"[The Defendant]: I'm still confused about the whole thing. It's, like, I'm forced to try to understand it away; that I can't quite get it in my head because it's not making any sense.

"The Court: What's not making sense?

"[The Defendant]: Everything. Like, the whole thing. Like, what's going on. I can't get it in my head. But if I go up there and testify, it's, like, I'm being told that it would be wrong, but how? I still don't get it.

"The Court: Your lawyer can only advise you on whether you should testify or not, you know. He can't stop you. I can only tell you that I have to find out what you have to say, and if it relates to the case—

"[The Defendant]: Yeah, but—

"The Court: I will allow you to testify.

"[The Defendant]: But—

"The Court: I'll make that decision first."

The defendant's attorney then conducted a direct examination of the defendant outside the presence of the jury. After the defendant answered seventy-two questions, he stopped answering. The court stated: "You have to answer his questions. Because, obviously, he's not going to be able to testify partly and then not answer. I'm going to instruct him to answer or we're going to strike all his testimony." When his attorney reiterated the court's instruction, the defendant answered: "Forget it. I don't want to do it." After a short recess, the defendant affirmed: "I can't. I can't do it."

"The Court: What do you mean, 'I can't do it?' You can't answer the questions? You have to answer me, Mr. Edwards. You can't answer the questions?

"[The Defendant]: No.

"The Court: Okay. All right. And so, obviously, you can't complete your examination by [the defendant's attorney] and, obviously, you're not going to be—we can't get to the—can't complete the direct examination. . . . He refused to answer any of the questions and walked off the [witness] stand. . . . So, that, so, the ruling of the court, I'm going to preclude his examination, direct and, or cross, in the presence of the jury based on the state of the record."

The defendant now claims that the court violated his constitutional right to testify before the jury by conducting an offer of proof outside of the jury's presence. "The right to testify on one's own behalf at a criminal trial has sources in several provisions of the [United States] Constitution. It is one of the rights that are essential to due process of law in a fair adversary process. . . . The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include

a right to be heard and to offer testimony . . . . The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call witnesses in his favor . . . . Logically included . . . is a right to testify himself. . . . The opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony. . . . A defendant's right to testify is also protected by his rights to a fair trial, to due process, to present a defense, and to be free from compelled testimony under article XVII of the amendments to the Connecticut constitution and under article first, § 8, of the Connecticut constitution." (Citations omitted; internal quotation marks omitted.) *State* v. *Shinn*, 47 Conn. App. 401, 410, 704 A.2d 816 (1997), cert. denied, 244 Conn. 913, 914, 713 A.2d 832, 833 (1998).

We conclude that the court's suggestion that the defendant partake in an offer of proof with his attorney did not preclude him from testifying before the jury. The right of the defendant to present a defense was "subject to appropriate supervision by the trial court in accordance with established rules of procedure and evidence . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Fisher*, 82 Conn. App. 412, 423, 844 A.2d 903, cert. denied, 269 Conn. 911, 852 A.2d 741 (2004). By requesting that there be an offer of proof of the defendant's testimony, the court merely sought to discover whether the evidence that would be offered would be relevant to the case. "The purpose of an offer of proof has been well established by our courts. First, it informs the court of the legal theory under which the evidence is admissible. Second, it should inform the trial judge of the specific nature of the evidence so that the court can judge its admissibility. Third, it creates a record for appellate review." (Internal quotation marks

omitted.) *State* v. *Walsh*, 67 Conn. App. 776, 786–87, 789 A.2d 1031, cert. denied, 260 Conn. 906, 795 A.2d 546 (2002). The court acted within its purview when it conducted the offer of proof, especially because there were clear indications that the defendant would testify about subject matter that was not relevant to the case. We conclude that the court's canvass was adequate to conclude that the defendant's request to testify on his behalf was not knowing, intelligent and voluntary.

In the alternative, the defendant argues that the court's actions impermissibly burdened his right to testify because they had "a chilling effect." Although we recognize that "[a] constitutional violation may result . . . when a constitutional right has been impermissibly burdened or impaired by virtue of state action that *unnecessarily chills or penalizes* the free exercise of the right"; (emphasis added; internal quotation marks omitted) *State* v. *Alexander*, 50 Conn. App. 242, 249, 718 A.2d 66 (1998), rev'd in part on other grounds, 254 Conn. 290, 755 A.2d 868 (2000); we are unpersuaded that the court's discussion with the defendant engendered such an effect. On the contrary, the court thoughtfully explained to the defendant the requirement that his testimony be relevant to the proceedings.

We note that at no time did the court's discussion with the defendant prevent him from testifying. On the contrary, the court consistently informed the defendant that it "would certainly consider" and "can't preclude" any relevant testimony. On several occasions, the court asked the defendant if he wanted to testify and stated that it could not prevent him from exercising that right. When the defendant asked the court to explain why his testimony might not be admissible, the court offered a thorough explanation of why his testimony could be damaging to his case. We conclude that the court was justified in having such a discussion with the defendant; cf. *State* v. *Fisher*, supra, 82 Conn. App. 422 (discussion

of court with pro se defendant proper regarding right to testify when defendant had rested case); and the defendant's right to testify was not violated.

Because an alleged constitutional violation does not clearly exist and did not clearly deprive the defendant of a fair trial, his claims that the court violated his constitutional rights to represent himself and to testify in his defense fail.

### III

The defendant next claims that, concerning the deaths of the two Wood Plus Deli employees, there was insufficient evidence of the underlying robbery to support the charges of felony murder and that the court's instructions on felony murder were improper and misleading. Both of these claims center on the contention that his conviction of two counts of felony murder was improper because the information charged him with the underlying crime of robbery in the felony murder counts, and the court instructed the jury that it could find the defendant guilty of felony murder if it found, inter alia, that he had *attempted* to commit a robbery. We are not persuaded.

The defendant concededly did not preserve his claims at trial and now seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. The defendant's claims satisfy the first prong of *Golding* because the record is adequate for review. They also satisfy the second prong of *Golding* because the first claim alleges insufficiency of the evidence, and the second claim alleges an improper jury instruction on an essential element of the crime charged. Our jurisprudence has held that both claims implicate violations of a fundamental right. See *State* v. *Allen*, 216 Conn. 367, 383, 388, 579 A.2d 1066 (1990) (claims that jury presented with alternative forms of committing offense for which there was no evidence

or insufficient evidence implicate fundamental right). Accordingly, we review the defendant's claims.

"Practice Book § 867 [now § 42-29][9] and General Statutes § 54-60[10] both provide that a criminal defendant can be convicted of either the crime charged in the information *or of the attempt to commit that crime.*" (Emphasis added.) *State* v. *March*, 39 Conn. App. 267, 271, 664 A.2d 1157, cert. denied, 235 Conn. 930, 667 A.2d 801 (1995); see also *State* v. *Phillips*, 67 Conn. App. 535, 541, 787 A.2d 616 (2002). The court charged the jury with the applicable elements necessary for a conviction of felony murder, as contained in § 53a-54c, which provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits *or attempts to commit* robbery . . . ." (Emphasis added.) A careful review of the record reveals that the court properly charged the jury on all of the elements necessary to find the defendant guilty of a violation of § 53a-54c. It is inconsequential that the state's information charged the defendant with robbery and the court charged only on attempted robbery as part of the charge on two counts of felony murder. "[T]he defendant had statutory notice that he could be convicted of any offense sufficiently alleged in the initial information and of an attempt to commit the substantive offense charged therein." (Internal quotation marks omitted.) *State* v. *Phillips*, supra, 541.

Accordingly, the defendant's two claims fail to satisfy the third prong of *Golding* because the defendant has

---

[9] Practice Book § 42-29 provides in relevant part: "The defendant, if found not guilty of the offense charged, may be found guilty of an offense necessarily included in the offense charged *or of an attempt* to commit either the offense charged or an offense necessarily included therein, if the attempt is an offense." (Emphasis added.)

[10] General Statutes § 54-60 provides: "Whenever any indictment, information or complaint is pending before any court, a conviction may be had for any offense sufficiently alleged therein *or for an attempt to commit such offense,* and the accused may be convicted or such court may accept a plea of guilty for any of such offenses." (Emphasis added.)

not shown that the alleged violations clearly exist and clearly deprived him of a fair trial.

## IV

The defendant further claims that the court violated his state and federal constitutional guarantee against double jeopardy. Specifically, the defendant argues that the court improperly (1) imposed sentences for the crimes of felony murder and capital felony in connection with the deaths of the two Wood Plus Deli employees and (2) imposed sentences for both stealing Kamenski's car and retaining it eleven days later. We agree.

"The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . . The double jeopardy clause is applicable to the states through the due process clause of the fourteenth amendment. . . . Although the Connecticut constitution has no specific double jeopardy provision, we have held that the due process guarantees of article first, § 9, include protection against double jeopardy." (Citations omitted; internal quotation marks omitted.) *State* v. *Miranda*, 260 Conn. 93, 118–19, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002); see also *State* v. *Nixon*, 231 Conn. 545, 550, 651 A.2d 1264 (1995) (right to protection against double jeopardy implicit in due process guarantee of state constitution).

"Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . The traditional test for determining whether two offenses are the same offense for double jeopardy purposes was set forth in

*Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Porter*, supra, 76 Conn. App. 484.

## A

The defendant admittedly failed to preserve his first claim at trial and now requests review under *State* v. *Golding*, supra, 213 Conn. 239–40. Because the record is adequate and a double jeopardy claim is of constitutional magnitude; see *State* v. *Chicano*, 216 Conn. 699, 704–705, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991); we review the defendant's claim.

The charged offenses in counts one through three in the third information, consisting of one count of capital felony and two counts of felony murder, are all related to the deaths of the two employees at the Wood Plus Deli.[11] Because all three counts arose out of the same act or transaction, the first prong of the double jeopardy analysis is satisfied. Turning to the second prong, the analysis dictates that "[t]he relevant inquiry then becomes whether each statutory violation requires proof of a fact which the other does not." (Internal quotation marks omitted.) *State* v. *Porter*, supra, 76 Conn. App. 485.

[11] Counts four and five alleged murder of the same two victims in violation of General Statutes § 53a-54a (a), and the court properly merged the two intentional murder counts into the capital felony count during sentencing. See *State* v. *Wood*, 208 Conn. 125, 145, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988). The court also merged the underlying felonies of attempt to commit robbery with the felony murder convictions.

The defendant's capital felony conviction necessarily included an underlying finding, beyond a reasonable doubt, that he had committed two murders in the course of a single transaction in violation of § 53a-54b (8) ("murder of two or more persons at the same time or in the course of a single transaction"). Therefore, to sentence him for capital felony, *as well as* for two felony murders, would amount to a violation of the defendant's constitutional guarantee against double jeopardy.

In finding a double jeopardy violation, we must also determine the remedy on remand. In cases in which the intention of the sentencing court is unclear, the court is given discretion on remand to decide which sentence to vacate. See *State* v. *Chicano*, supra, 216 Conn. 714 n.16; *State* v. *Barber*, 64 Conn. App. 659, 678, 781 A.2d 464, cert. denied, 258 Conn. 925, 783 A.2d 1030 (2001).[12] In the present case, however, the court's intention was clear in sentencing the defendant to a life term of imprisonment without the possibility of release on the capital felony count and sixty years *concurrent* for each of the felony murder counts. Accordingly, we order the court to combine the conviction of two counts of felony murder with the conviction of capital felony and to vacate the sentences for each of the felony murder counts.

B

The defendant also claims that it was improper to convict him of larceny of Kamenski's vehicle on December 4, 2000, and of retaining the same vehicle on December 15, 2000, both in violation of § 53a-123 (a) (1). We agree and remand the case to the court with direction to combine the conviction of those two charges and to

[12] For a detailed description of our Supreme Court's policy regarding proper sentencing for double jeopardy violations, see *State* v. *Chicano*, supra, 216 Conn. 721–25.

vacate the sentence for the charge of larceny in the second degree in the fourth information.

The defendant properly preserved his second double jeopardy claim because, at the conclusion of the state's case-in-chief, he moved for a judgment of acquittal on that ground.[13] See, e.g., *State* v. *Torrice*, 20 Conn. App. 75, 95 n.12, 564 A.2d 330 (double jeopardy claim reviewable because defendant had filed motion for judgment of acquittal on same ground), cert. denied, 213 Conn. 809, 568 A.2d 794 (1989).

We begin our analysis by considering the first prong of the double jeopardy analysis. "In deciding whether the crimes arose out of the same act or transaction, we analyze the language of the information." *State* v. *Nita*, 27 Conn. App. 103, 113, 604 A.2d 1322, cert. denied, 222 Conn. 903, 606 A.2d 1329, cert. denied, 506 U.S. 844, 113 S. Ct. 133, 121 L. Ed. 2d 86 (1992). The second information alleged that the defendant, "on the 4th day of December, 2000 . . . did steal certain property from . . . Kamenski, to wit: a motor vehicle, the value of which exceeds $5,000, in violation of [§] 53a-123 (a) (1) . . . ." The fourth information alleged that the defendant, "on the 15th day of December, 2000 . . . did unlawfully retain stolen property to wit: a motor vehicle, the value of which exceeds $5,000, in violation of [§] 53a-123 (a) (1) . . . ." Because both counts concern the taking of Kamenski's car on December 4, 2000, we conclude that both arose out of the same act.

We now analyze the claim under the second prong of the double jeopardy analysis to determine whether the charged crimes are the same offense. The defendant

[13] The defendant's attorney explained to the court his reason for filing the motion: "Larceny by—with retaining the property of another, it seems to me that that's the same transaction or occurrence as the original taking and that that would be subject to a merger doctrine . . . ." The court summarily denied the motion.

alleges that larceny is a continuing crime, and that the legislature intended that larceny and the retention of the same stolen goods should not be separately punishable. We agree that larceny is a continuing crime under our law; see *State* v. *Benson,* 153 Conn. 209, 218, 214 A.2d 903 (1965); but because the larceny statutes are unclear regarding whether their different parts constitute grounds for separate convictions for the same act, we look to the legislative intent. "The key to determining whether the continuing offense doctrine applies is legislative intent. Our Supreme Court has explained that [t]he proper double jeopardy inquiry when a defendant is convicted of multiple violations of the same statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute." (Internal quotation marks omitted.) *State* v. *Williams,* 59 Conn. App. 603, 607, 757 A.2d 1191, cert. denied, 254 Conn. 946, 762 A.2d 907 (2000).

Larceny is defined in General Statutes § 53a-119, which provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." The statute then enumerates eighteen separate examples that constitute larceny, including by the receipt, retention or possession of stolen goods. See General Statutes § 53a-119 (8) ("[a] person is guilty of larceny by receiving stolen property if he receives, retains, or disposes of stolen property knowing that it has probably been stolen or believing that it has probably been stolen, unless the property is received, retained or disposed of with purpose to restore it to the owner").

The commentary of the commission to revise the criminal statutes states: "Subsections (1) to (9) [of § 53a-119], it should be noted, are not exclusive. They

are not meant to limit the broad definition set out in the first paragraph of this section, but are meant as certain specific ways of committing the offense." Connecticut General Statutes Annotated § 53a-119 (West 2002) commission comment; see also *State* v. *Desimone*, 241 Conn. 439, 456, 696 A.2d 1235 (1997) (commission's commentary stated that § 53a-119 (8) "was meant to make clear that the [crime] of . . . receiving stolen property [is a form] of the general crime of larceny" [internal quotation marks omitted]). "Since the crimes of larceny, receiving, and possession of stolen property are separate and distinct offenses, generally legislatures do not intend to punish a defendant for receiving or possessing the same goods that he or she stole." 50 Am. Jur. 2d 121, Larceny § 111 (2006).[14]

Both of the counts alleged violations of § 53a-123, larceny in the second degree, which provides in relevant part: "(a) A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and: (1) The property consists of a motor vehicle, the value of which exceeds five thousand dollars . . . . (b) . . . . In any prosecution under subdivision (1) of subsection (a) of this section, evidence of (1) forcible entry . . . shall be prima facie evidence (A) that the person in control or possession of such motor vehicle knows or should have known that such motor vehicle is stolen, and (B) that such person *possesses* such motor vehicle with larcenous intent." (Emphasis added.) It is unquestionable that the defendant is guilty of forced entry into Kamenski's vehicle, as he used the gun to force Kamenski out of the vehicle in order to enter and drive away. The knowledge element is directly referenced in § 53a-119 (8), and it is reasonable to equate the possession referenced in § 53a-123 (b) with the act of retention. We conclude that the language of

---

[14] We see no reason why the crime of *retaining* stolen property would require a different analysis from that of *receiving* stolen property.

§ 53a-123 implicates both the taking and subsequent retention of the stolen property and, thus, the defendant's constitutional guarantee against double jeopardy was violated.[15]

We remand the case to the court with direction to combine the conviction of larceny in the second degree from the second information with the conviction of larceny in the second degree found in the fourth information. Additionally, we order that the sentence for the retention of stolen property violation be vacated.[16]

V

The defendant's final claim is that § 53a-136a is not a separate crime, but rather a sentence enhancer. He asserts that, although his sentence would be unaffected, his conviction under that statute must be vacated. We agree with the defendant.[17]

[15] The state urges us to consider *State* v. *McNally*, 122 N.H. 892, 451 A.2d 1305 (1982), for the proposition that the legislative purpose of unlawfully taking property differs from that of unlawfully retaining property. The state's brief contends: "The purpose in punishing the unlawful taking of property is to protect private property. . . . In contrast, [p]unishment for retention of stolen property deters a thief from enjoying the fruits of his illegal activity. Although this may constitute double punishment, it is constitutionally permissible." (Internal quotation marks omitted.) *McNally* is inapposite to this case, as it concerned a criminal defendant who was tried and convicted in Massachusetts for larceny. See id., 895. The New Hampshire Supreme Court determined that the defendant could be punished independently for retaining the stolen goods in New Hampshire due to the policy differences in the applicable statutes of the two states. Id., 897. Absent a clear mandate from our legislature, we decline the state's invitation to conclude that it intended both crimes to be separately punishable.

[16] Because the court sentenced the defendant to ten years for having stolen Kamenski's vehicle, and only five for having retained the stolen vehicle, we conclude that the court clearly intended the former sentence to be superior to the latter.

[17] Although the sentence remains, the conviction must be vacated because "adverse collateral consequences may result from the fact of an additional conviction . . . ." *State* v. *John*, 210 Conn. 652, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

Conceding that his claim is unpreserved, the defendant once again requests, and we afford, review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, because we find the record adequate for review and the claim to be of constitutional magnitude. See generally *State* v. *Cator*, 256 Conn. 785, 805, 781 A.2d 285 (2001).

Our analysis is governed by the well established principles of statutory construction. "Statutory construction is a question of law and, therefore, our review is plenary. . . . The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Wilson* v. *Jefferson*, 98 Conn. App. 147, 154, 908 A.2d 13 (2006).

Section 53a-136a is entitled "Robbery involving occupied motor vehicle. Penalty." It provides: "Any person who commits robbery by taking a motor vehicle from the person of another knowing that such motor vehicle is occupied by such other person shall be imprisoned for a term of three years which shall not be suspended and *shall be in addition and consecutive to any term of imprisonment imposed for such offense.*" (Emphasis added.) General Statutes § 53a-136a. Although the plain language of § 53a-136a does not provide explicit guidance as to whether it is a sentence enhancement statute, a comparison with the other robbery statutes illustrates the differences. The titles of General Statutes §§ 53a-134, 135 and 136 each include the class of felony that the particular statute encompasses.[18] In contrast, § 53a-136a merely includes the word "Penalty." The fact that

[18] General Statutes § 53a-134 is entitled: "Robbery in the first degree: Class B felony," General Statutes § 53a-135 is entitled: "Robbery in the second

the three years mandatory sentence "shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed" for having committed a robbery provides evidence that the legislature intended § 53a-136a to be a sentence enhancement statute.

Although there is no case law that specifically addresses whether a violation of § 53a-136a can lead to a conviction independent of one of the robbery statutes, the defendant's reliance on *State* v. *Dash*, 242 Conn. 143, 698 A.2d 297 (1997), is apposite. In *Dash*, our Supreme Court addressed whether the defendant's conviction under General Statutes § 53-202k was improper. The court analyzed the statutory language to determine that the statute was intended to enhance the relevant sentence. "Although the plain language of § 53-202k does not illuminate whether that statute is a sentence enhancement provision, the title of § 53-202k, 'Commission of a class A, B, or C felony with a firearm: *Five year nonsuspendable sentence*'. . . suggests that the legislature's overriding purpose in enacting § 53-202k was not to create a separate offense but, rather, to establish an enhanced penalty for persons who commit a class A, B or C felony with a firearm. Furthermore, unlike other provisions in which the legislature has penalized aggravated conduct of the kind contemplated by § 53-202k; see, e.g., General Statutes §§ 53a-216 and 53a-217; § 53-202k contains no language to indicate that it is, in fact, a separate felony offense." (Emphasis in original.) *State* v. *Dash*, supra, 147–48. Similarly, we conclude that § 53a-136a contains no indication that it provides more than a mandatory sentence enhancement.

The state argues that the requirement of an additional element to establish a violation of § 53a-136a indicates

degree: Class C felony" and General Statutes § 53a-136 is entitled: "Robbery in the third degree: Class D felony."

that it must be a separate offense and not merely a sentence enhancement provision. We are not persuaded that the requirement of proof of an additional element dictates whether a statute is a sentence enhancement provision. Again, § 53-202k provides an illustrative example. See, e.g., *State* v. *Brown*, 259 Conn. 799, 807–808, 792 A.2d 86 (2002) (court properly instructed jury only on second element of § 53-202k); *State* v. *Feliciano*, 74 Conn. App. 391, 404, 812 A.2d 141 (2002) ("application of § 53-202k depends on factual findings concerning the *two elements* of that statute: [1] that the defendant committed a class A, B or C felony and [2] that the defendant committed such felony with the use of a firearm" [emphasis added]), cert. denied, 262 Conn. 952, 817 A.2d 110 (2003).[19]

We conclude that § 53a-136a is a sentence enhancement provision and not a separate crime. Accordingly, although the defendant's total effective sentence will be unaffected, the judgment must be modified to reflect that § 53a-136a is not a separate offense, and the defendant's separate conviction under that statute must be vacated.

The judgment is reversed in part and the case is remanded with direction to combine the two convictions of felony murder with the conviction of capital felony, to vacate the sentences for both of the felony murder convictions, to vacate the sentence for larceny by retention of stolen property and to vacate the conviction under § 53a-136a. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

[19] Although we recognize that "[m]ost enhancement provisions are triggered by the defendant's criminal history"; *United States* v. *McQuilkin*, 78 F.3d 105, 109 (3d Cir.), cert. denied, 519 U.S. 826, 117 S. Ct. 89, 136 L. Ed. 2d 45 (1996); the thorough analysis of § 53-202k in our jurisprudence convinces us that evidence of a criminal history is not a prerequisite for a sentence enhancement provision.